UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**LUNISE PAUL,**
    Debtor

Chapter 7
Case No. 04-14943-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~

**LUNISE PAUL,**
    Plaintiff,

v.

**SUFFOLK UNIVERSITY, JUDITH I.
GILL, and EDUCATIONAL CREDIT
MANAGEMENT CORPORATION,**
    Defendants.

Adv. P. No. 04-1224-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

The matter before the Court is the Complaint filed by the Debtor, Lunise Paul (the

"Debtor"), against the Defendant, Educational Credit Management Corporation ("ECMC"

or the "Defendant"), through which she seeks a determination that her student loan debt

is dischargeable under 11 U.S.C. § 523(a)(8) on the basis that repayment would impose

an undue hardship on her and her dependents.  ECMC answered the Complaint, and,

following discovery, the Court conducted a trial on September 20, 2005.  At trial, the

Debtor and Deborah J. Veatch, a vocational rehabilitation expert retained by the Debtor,

1

testified and nine exhibits were introduced in evidence. Following the trial, the Court took under advisement the issue of whether excepting the student loan debt from discharge, either in whole or in part, would impose an undue hardship on the Debtor, and both parties submitted memoranda of law. Pursuant to Fed. R. Bankr. P. 7052, the Court now makes the following findings of fact and conclusions of law.

## II. PROCEDURAL HISTORY

The Debtor filed a voluntary petition under Chapter 7 on June 14, 2004. On March 8, 2005, the Debtor received a discharge of all dischargeable debts under 11 U.S.C. § 727.

The Debtor commenced the present adversary proceeding on July 14, 2004, when she filed a Complaint against Suffolk University, the Chancellor of the Massachusetts Board of Higher Education (the "Commonwealth"), and American Student Assistance Corporation ("ASA") seeking a discharge of her student loans. Both the Commonwealth and Suffolk University executed agreements for judgment with the Debtor in which they stipulated that repayment of the student loans in the total amount of $4,187.66 would cause undue hardship to the Debtor and her dependents. The Court approved these agreements and entered judgments in favor of the Debtor. Accordingly, debts resulting from the loans extended by the Commonwealth and Suffolk University have been discharged.

On August 2, 2004, the Court granted ECMC's motion to be substituted as a party defendant as ASA's successor in interest. ECMC currently holds the Debtor's seven remaining student loan obligations totaling over $53,000. In its Answer, ECMC asserted

2

that the Debtor's Complaint failed to state a cause of action.

**III. FACTS**

The Debtor is a 34-year-old, single mother with three children, ages 3, 6, and 10. She immigrated to the United States from Haiti in 1990. English is her second language. The Debtor completed her final year of high school at Hyde Park High School in Boston, Massachusetts and matriculated at Suffolk University in the Fall of 1991. She pursued a course in General Studies culminating in a Bachelor's Degree in 1996. On the advice of her guidance counselor, the Debtor remained at Suffolk University and pursued a Master's Degree in Public Administration, which she received in 1997. The Debtor believed that this advanced degree would qualify her for a managerial position with a salary of $40,000 or more per year and also would delay repayment of the student loans used to finance her undergraduate education, including the seven loans, evidenced by seven promissory notes, now held by ECMC.

Upon graduation from Suffolk University, the Debtor encountered difficulty securing permanent employment. She consulted with the staff at the career placement office at Suffolk University, attended career fairs at the university, and answered advertisements in newspapers in hopes of gaining employment. In 2000 and 2003, the Debtor held various data entry and health assistant jobs at rates ranging from $10 to $15 per hour. Since 2003, the Debtor has been employed full time as a home health coordinator at Parmenter VNA & Community Care, Inc. in Wayland, Massachusetts, which is approximately 16 miles from her residence in Roslindale, Massachusetts.

3

The Debtor's present gross income is approximately $2,400 monthly. According to the Debtor, there does not appear to be any possibility for a promotion or pay increase in the foreseeable future. The Debtor testified that she does not intend to remain in her present position permanently, but she has not looked for other employment.

Although the Debtor testified that her income has increased every year since 2001, she also stated that it was unlikely that she would receive raises in her current job in the foreseeable future. The Debtor's federal income tax returns reflect salary increases and concomitant tax refunds. In 2001 she received $2,500; in 2002 she received $5,875; in 2003 she received $5,914; and in 2004 she received $7,028.

In addition to her regular income, in the past year the Debtor also received $25,000 from a settlement, arising out of an adversary proceeding the Debtor brought against Delta Management Associates, Inc., an agent of ASA, for alleged unfair debt collection actions and stay violations. *See* Paul v. Delta Mgmt. Assoc., Inc., Adv. P. No. 04-1213. The Debtor purchased a certificate of deposit with the $25,000 settlement which is accruing interest. The Debtor has not paid any part of the settlement proceeds towards her student loans.

The Debtor currently lives in the first floor of a triple-decker apartment building owned by her brother in Roslindale, Massachusetts. She occupies a three-bedroom apartment with her parents, a 16-year-old sister, and her three children. She pays her brother $1,000 per month for rent, while her parents are responsible for paying the gas, heat, and electricity. At trial, the Debtor testified that her monthly expenses include $400

4

for food, $158 for gas, oil, car maintenance, and auto insurance, $64 for phone service, $158 in un-reimbursed medical expenses, $45 per week for child care, and $11.54 every two weeks for dental insurance. In three of the last twelve months, the Debtor also purchased health insurance for her three children at a cost of $108 per month. The Debtor receives Women, Infant, and Children vouchers enabling her to purchase milk, cheese, juice, and peanut butter, but she does not receive any other welfare benefit or government assistance.

The two fathers of the Debtor's children currently provide no support. The Debtor testified that she knows their identity and is aware of the whereabouts of one, but not the other. She has made no effort to seek child support from either father and does not plan to do so in the future.

The Debtor owns a 1993 Subaru Impreza, which she uses to make her 32 mile round trip commute. Each morning, before driving to work, the Debtor drops each of her children off at three different schools. The Debtor testified that her vehicle is in poor condition and frequently breaks down. The Debtor wishes to use a portion of the $25,000 received from her settlement to purchase a more reliable car.

The Debtor's budget does not provide for any recreational or cultural activities for herself or her children. She cannot afford to and does not take her children to movies or other cultural events unless they are free. Previously, the Debtor took her children on an annual trip to Canobie Lake Park, but can no longer afford to do so. She does not own a DVD player or VCR and, therefore, cannot rent movies. Her children do not watch cable

5

television because she cannot afford it. Neither she nor her children have regular access to a computer to learn computer skills or access the Internet.

During the trial, Deborah J. Veatch, a vocational rehabilitation expert, who testified on behalf of the Debtor, stated that the Debtor is presently working to her full capacity.[1] Ms. Veatch based this conclusion on the Debtor's lack of skill, time, and computer resources to independently seek professional level employment, as well as a lack of financial resources for individualized career counseling. In performing her analysis, Ms. Veatch interviewed the Debtor and reviewed her transcripts and writing samples. She determined that the Debtor lacks the business and linguistic skills necessary to obtain professional employment. In her expert opinion, the Debtor would need to devote 40 hours per week for six months to career counseling in order to obtain new employment to improve her situation.

Ms. Veatch also noted that most graduates of Suffolk University's Public Administration Master's Degree program, unlike the Debtor, already had work experience prior to entering the program. According to Ms. Veatch, students with work experience obtain their post-graduate degrees for the purpose of advancing their careers and securing leadership roles in their professions. Moreover, she testified that because the Debtor entered the Public Administration Master's Degree program directly after graduating the Debtor needs to spend years obtaining the experience other students had before entering the program.

---

[1] The Debtor, who is represented *pro bono* by counsel, was able to secure the assistance of Ms. Veatch also on a *pro bono* basis.

6

Although ECMC did not call witnesses of its own to rebut the Debtor's testimony and that of Ms. Veatch, it submitted, as Defendant's Exhibit 2, a letter to the Debtor's attorney, dated November 19, 2004, in which its counsel outlined four repayment options under the William D. Ford Federal Direct Loan Program (the "Ford Program"). The fourth repayment option under the Ford Program is an Income Contingent Repayment ("ICR") Plan, whereby the amount of the monthly payments are calculated based upon the borrower's annual income, the total amount borrowed, and family size. The ICR contains provisions that reduce plan payments to zero if the Debtor's financial situation deteriorates. Under the ICR Plan the Debtor's payments would be approximately $188.33 per month for a term of nineteen and a half years. At the end of the repayment period, the Debtor would realize ordinary income equal in an amount equal to the unpaid principal and accumulated interest consistent with the forgiveness of indebtedness provisions of the Internal Revenue Code.[2]

On cross-examination counsel for ECMC asked the Debtor if she had considered loan consolidation under the Ford Program. The Debtor responded that she would not consider consolidation because she did not think she could afford it. The Court took judicial notice of the Ford Program at the request of ECMC.

---

[2] If the Debtor were insolvent at this time, she could make an offer and compromise to the IRS to settle the tax liability.

## III. POSITIONS OF THE PARTIES

### A. The Debtor

The Debtor argues that excepting her student loan debt from discharge would cause her and her dependents an undue hardship under 11 U.S.C. § 523(a)(8). She contends that she cannot afford to make the minimum payments for even one of her loans. She emphasizes that her limited English language skills and childcare responsibilities make it impossible for her to find or hold a higher paying position. The Debtor maintains that her job prospects are unlikely to change in the foreseeable future. Additionally, she asserts that her standard of living is below an acceptable minimum because she cannot afford medical insurance, a new vehicle to replace her 12-year-old car, or any recreational or cultural enrichment opportunities for herself or her children.

The Debtor also argues that any increase in her earnings should be devoted to increasing her standard of living rather than repaying student loans for an education that has not yielded her the benefits she expected. Citing Burkhead v. United States (In re Burkhead), 304 B.R. 560, 564 (Bankr. D. Mass. 2004) and Anelli v. Sallie Mae Servicing Corp. (In re Anelli), 262 B.R. 1, 8 (Bankr. D. Mass. 2000), the Debtor maintains that under the totality of circumstances test for undue hardship, all of her student loans should be discharged.

8

B. <u>The Defendant</u>

ECMC asks the Court to deny the relief sought by the Debtor, contending that the Debtor has not demonstrated undue hardship by a preponderance of the evidence. ECMC argues: 1) the Debtor is able to pay necessary living expenses while repaying the student loans; 2) there is no evidence that the Debtor's circumstances will not improve over the repayment period; and 3) the Debtor has failed to make good faith efforts to repay the loans by taking advantage of the Ford Program for consolidation. While ECMC believes the Debtor cannot satisfy her burden under any standard, it also urges the Court to apply the test articulated by the Second Circuit in <u>Brunner v. New York State Higher Educ. Servs. Corp. (In re Brunner)</u>, 831 F.2d 395, 396 (2d Cir. 1987). Alternatively, ECMC requests the Court consider a partial discharge in the event the Court finds undue hardship.

## IV. DISCUSSION

A. <u>Applicable Law</u>

Because the Debtor is seeking to discharge her student loan debt, she bears the burden of proving undue hardship by a preponderance of the evidence. <u>Lorenz v. Amer. Educ. Servs., Inc. (In re Lorenz)</u>, __ B.R. __, 2006 WL 231497 (B.A.P. 1st Cir. Feb. 1, 2006); <u>Kopf v. United States Dept. of Educ. (In re Kopf)</u>, 245 B.R. 731, 734 (Bankr. D. Me. 2000). The Bankruptcy Code does not define "undue hardship," and courts have struggled with its meaning. Courts have generally adopted one of two approaches: the totality of the circumstances approach or the widely-accepted <u>Brunner</u>, test, which requires a showing

9

that "(1) the debtor cannot maintain, based current income and expenses, a "minimal" standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans." 831 F.3d at 396.  *Compare* Long v. Educ. Credit Mgmt. Corp., 322 F.3d 549, 554 (8th Cir. 2003)(totality of the circumstances) *with* Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler), 397 F.3d 382, 385 (6th Cir. 2005)(adopting Brunner test); Educ. Credit Mgmt. v. Polleys, 356 F.3d 1302, 1319 (10th Cir. 2004)(same); United States Dep't of Educ. v. Gerhardt (In re Gerhardt), 348 F.3d 89, 91 (5th Cir. 2003)(same); Hemar Ins. Corp. of Amer. v. Cox (In re Cox), 338 F.3d 1238, 1241 (11th Cir. 2003), *cert. denied,* 541 U.S. 991 (2004)(same); Ekenasi v. Educ. Resources Institute (In re Ekenasi, 325 F.3d 541, 546 (4th Cir. 2003); United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1114 (9th Cir. 1998)(same); Pa. Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298, 306 (3d Cir. 1996); *cert. denied,* 518 U.S. 1009 (1996)(same); In re Roberson, 999 F.2d 1132, 1135 (7th Cir. 1993)(same). "The significant difference between the Brunner approach and the totality of the circumstances test is the requirement in Brunner that a debtor demonstrate that she has made good faith efforts to repay the educational loans at issue." Kelly v. Educ. Credit Mgmt. Corp. (In re Kelly), 312 B.R. 200, 206 (B.A.P. 1st Cir. 2004).  The United States Court of Appeals for the First Circuit has not directly addressed the issue, although, in dictum, it offered some guidance by suggesting that the "hardship alleged . . . must be undue and attributable to truly

exceptional circumstances, such as illness or the existence of an unusually number of

dependents." TI Federal Credit Union v. DelBonis, 72 F.3d 921, 927 (1st Cir.1995).

The plain language of 11 U.S.C. § 523(a)(8) does not mandate a particular test, and

the Bankruptcy Appellate Panel for the First Circuit has determined that bankruptcy

courts are free to choose their own approach to determining undue hardship. Kelly v.

Educ. Credit. Mgmt. Corp. (In re Kelly), 312 B.R. at 206. Most courts within the First

Circuit have adopted the "totality of circumstances" test. Hicks v. Educ. Credit Mgmt.

Corp. (In re Hicks), 331 B.R. 18, 32 (Bankr. D. Mass. 2005); Lamanna v. EFS Servs., Inc. (In

re Lamanna), 285 B.R. 347, 353 (Bankr. D. R.I. 2002); Kopf, 245 B.R. at 741. Nevertheless,

several courts within this circuit have applied the Brunner test. See Gallagher v. Educ.

Credit Mgmt. Corp. (In re Gallagher), 333 B.R. 169, 173 (Bankr. D.N.H. 2005); Garrett v.

New Hampshire Higher Learning Educ. Assistance Fund (In re Garrett), 180 B.R. 358, 362

(Bankr. D.N.H. 1995).

This Court has previously ruled that the debtor must "demonstrate that the

'totality of circumstances' warrants discharge of the student loan debt" to satisfy her

burden. Burkhead, 304 B.R. at 564; Anelli, 262 B.R. at 8. This Court's use of the totality

of the circumstances test has recently been upheld in Nash v. Connecticut Student Loan

Foundation (In re Nash), 330 B.R. 323, 326-327 (D. Mass. 2005).

Having considered the various tests used to determine undue hardship;

recognizing the sole difference between the totality of the circumstances test and the

Brunner test is the Brunner requirement that a debtor demonstrate good faith efforts to

11

repay the educational loans at issue; and further recognizing that the majority of courts

in the First Circuit adopt the totality of the circumstances test, this Court adopts the

totality of the circumstances test. In re Kelly, 312 B.R. at 206.  This test has most recently

been articulated by the Bankruptcy Appellate Panel for the First Circuit in the Lorenz

decision. Lorenz,__ B.R. __, 2006 WL 231497 (B.A.P. 1st Cir. Feb. 1, 2006).

> The "totality of the circumstances" analysis requires a debtor to
> prove by a preponderance of the evidence that (1) his past, present,
> and reasonably reliable future financial resources; (2) his and all his
> dependents' reasonably necessary living expenses; and (3) other
> relevant facts or circumstances unique to the case, prevent him from
> paying the student loans in question while still maintaining a
> minimal standard of living, even when aided by a discharge of other
> pre-petition debts.  Kopf, 245 B.R. at 739; *see also* Hicks v. Educ.
> Credit Mgmt. Corp. (In re Hicks), 331 B.R. 18, 31 (Bankr. D. Mass.
> 2005) (distilling so-called totality of the circumstances to "one simple
> question: *Can the debtor now, and in the foreseeable future, maintain a*
> *reasonable, minimal standard of living for the debtor and the debtor's*
> *dependants and still afford to make payments on the debtor's student*
> *loans?*").   Courts "should consider all relevant evidence — the
> debtor's income and expenses, the debtor's health, age, education,
> number of dependents and other personal or family circumstances,
> the amount the monthly payment required, the impact of the general
> discharge under chapter 7 and the debtor's ability to find a higher-
> paying job, move or cut living expenses.  In addition, other factors
> not listed here may impact a debtor's case.  Hicks, 331 B.R. 31; *see*
> *also* Kelly, 312 B.R. at 206; [Educ. Credit Mgmt. Corp. v.] Savage [(In
> re Savage)], 311 B.R. 835] at 840 [(B.A.P. 1st Cir. 2004)]; Bloch v.
> Windham Prof'ls (In re Bloch), 257 B.R. 374, 378 (Bankr. D. Mass.
> 2001); Kopf. 245 B.R. at 744.

Lorenz, 2006 WL 231497 at *5.

B. Analysis

Applying the totality of the circumstances test to the evidence in the present case,

12

the Court concludes that the Debtor has not sustained her burden of proving repayment of the balance of her students loans would impose an undue hardship on herself and her dependents.

The Debtor currently holds a certificate of deposit for $25,000 plus interest, which she received in settlement of an adversary proceeding brought against an agent of ECMC's predecessor for unfair debt collection and stay violations. She plans to use some of the funds to purchase a new car and obtain new housing, and to save the balance. The Debtor does not plan to use any of these funds to repay the substantial student loan debt she owes. ECMC correctly points out that this situation is very similar to the facts in Nash v. Connecticut Student Loan Foundation (In re Nash), Adv. P. No. 02-1466, aff'd, 330 B.R. 323 (D. Mass. 2005), in which this Court found that it was unreasonable for a debtor to keep $10,000 in savings to be used for non-student loan expenses while not paying any existing student loan debt. Accordingly, the Court cannot find that the Debtor has established repayment would present an undue hardship while retaining a substantial sum of money.

Additionally, the Debtor's tax refunds are a sufficiently reliable source of funds. The Debtor acknowledged that each year she receives a significant refund, which has increased as her income has increased. While the she does not expect any pay increases in her current position, it is reasonable to expect that if even she continues to earn income at her current level she will receive the same tax refund yearly. Based upon her 2004 tax refund of $7,028, she, in effect, has additional income each month of approximately

13

$585.66 per month.

Furthermore, the Debtor has not carried her burden of demonstrating that her prospect of future income increases is so poor as to warrant a discharge of her student loans. Financial adversity alone is insufficient to warrant a student loan discharge on the basis of undue hardship. Bloch, 257 B.R. at 378. Unemployment or underemployment are insufficient per se to establish undue hardship. Healey v. Massachusetts Higher Educ. (In re Healey), 161 B.R. 389 (Bankr. E.D. Mich. 1993). See Grigas v. Sallie Mae Servicing Corp. (In re Grigas), 252 B.R. 866, 875 (Bankr. D. N.H. 2000) (finding the Debtor's confinement of her job search to the art field despite her degree was unreasonable in light of her ability to secure higher paying secretarial work).

Additionally, the Court is not convinced the Debtor is maximizing her income for several reasons. Although the Debtor's vocational rehabilitation expert stated that she is "working to her fullest capacity *at this point in time*," Ms. Veatch also indicated that the Debtor is underemployed in her current position. (Trial Trans. at 99 ¶ 15-16) (emphasis added). The Debtor has made no effort to try to find a higher paying job. According to Ms. Veatch, the Debtor could find professional level employment if she were to spend six months searching for a better job. Given the Debtor's Master's Degree, it is not unreasonable to expect her to search for higher paying work in her chosen profession.

The Court is not unsympathetic to the Debtor's difficulties. Her expenses are reasonable and, although she pays an increased share of the rent, it is a fair allocation because the Debtor's parents provide a benefit by assisting her with the children. Given

14

her obligations to her three children, the Court rejects ECMC's position that the Debtor

should be compelled to obtain additional part-time employment. However, the Debtor

has failed to demonstrate that her difficulties will persist into the future. The evidence

presented suggests that the Debtor's ability to earn income will in fact improve as a result

of finding a new job.

Furthermore, the Debtor has failed to maximize income or reduce expenses by

pursuing child support from the fathers of her children. The Court takes judicial notice

of various provisions under Massachusetts law that assist custodial parents in the

collection of child support. For example, the Administrative Office of the Trial Court has

established child support guidelines to be applied in all cases effecting support to

determine the amount of the obligation. Mass. Gen. Laws. ch. 119, § 28(d) (2005). These

guidelines provide for minimum payments regardless of the non-custodial parent's

income. Additionally, the Department of Revenue's Child Support Enforcement Division

("the Division") aides custodial parents in establishing and enforcing child support

orders. Mass. Gen. Laws. ch. 119A, § 2 (2005). Once a support order has been established,

the Division will collect the obligation for the custodial parent through garnishment,

interception of funds, seizure of property, or placement of liens. The Debtor has not

carried her burden by taking advantage of these remedies or demonstrating why they

would be futile.

Finally, the Debtor has not carried her burden in demonstrating why repayment

is not feasible due to her rejection of consolidation options available under the Ford

15

Program.  The Debtor attacks the ICR Plan on two grounds.  First, the Debtor argues that courts have found undue hardship even where the ICR Plan payments would be zero. Durrani v. Educ. Credit Mgmt. Corp. (In re Durrani), 311 B.R. 496, 506-509 (Bankr. N.D. Ill. 2004), aff'd, 320 B.R.357 (N.D. Ill. 2005) (Debtor with a remaining working life of 3 years and severe health problems granted a discharge despite eligibility for the ICR Plan); Korhonen v. Educ. Credit Mgmt. Corp. (In re Korhonen), 296 B.R. 492, 497 (Bankr. D. Minn. 2003) (finding the ICR Plan unfeasible where the debtor was an unskilled worker with severe physical and psychological limitations).  The Court is unpersuaded by these decisions because they are distinguishable.  The Debtor is healthy and currently has a working life of over 30 years while the maximum payment period available under the Ford Program is only 25 years.  She has not presented evidence showing that income contingent payments, which may be reduced to zero, are not feasible under these circumstances.

The Debtor also argues that the ICR Plan is inequitable because at the end of the repayment period, she would realize income in the amount of the unpaid principal and accumulated interest.  The Court finds this reasoning unpersuasive because one of two events could occur by the end of the payment period.  First, the Debtor's position could have improved to the point where she repaid the full amount of the debt.  Second, the Debtor could be insolvent at the end of the payment period, and could enter into the offer in compromise program and reach a settlement agreement with the Internal Revenue Service.

16

Accordingly, the Court finds that the Debtor has not proven by a preponderance of the evidence that repayment of her student loans would impose an undue hardship on herself or her dependents. Because the Debtor has not carried her burden, the Court will not consider whether a partial discharge is appropriate. The Sixth, Ninth, Tenth, and Eleventh Circuit Courts of Appeal have all held that a partial discharge cannot be addressed without first establishing undue hardship. Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete), 412 F.3d 1200 (10th Cir. 2005); Miller v. Pennsylvania Higher Educ. Assistance Agency (In re Miller), 377 F.3d 616 (6th Cir. 2004); Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman), 325 F.3d 1168 (9th Cir. 2003); Hemar Ins. Corp. of Amer. v. Cox (In re Cox), 338 F.3d 1238 (11th Cir. 2003), cert. denied, 541 U.S. 991 (2004). While the First Circuit has not addressed this issue, the Court notes that bankruptcy courts within this Circuit have and determined a finding of undue hardship is a prerequisite for granting a partial discharge. Lamanna, 285 B.R. at 353; Coutts v. Educ. Credit Mgmt. Corp. (In re Coutts), 263 B.R. 394, 401 (Bankr. D. Mass. 2001); Grigas, 252 B.R. at 874; Kopf, 245 B.R. at 741. The Court is satisfied that a threshold finding that repayment of the student loans imposes an undue hardship before a partial discharge will be considered is consistent with Congressional intent behind 11 U.S.C. § 523(a)(8). Therefore, the Debtor is not entitled to a partial discharge because she has not satisfied her burden of demonstrating an undue hardship.

17

## V. CONCLUSION

In accordance with the foregoing, the Court shall enter judgment in favor of the

Defendant and against the Debtor.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: February 8, 2006
cc: Walter Oney, Esq., John F. White, Esq.